W. Willard WIRTZ, Secretary of Labor, United States Department of Labor, Appellant,

v.

E. A. LaFITTE, Sr., and E. A. LaFitte, Jr., Individually, and as Co-Partners in the LaFitte Company, Appellees.

No. 20135.

United States Court of Appeals Fifth Circuit.

Jan. 24, 1964.

Charles Donahue, Solicitor of Labor, United States Department of Labor, Washington, D. C.

Earl Street, Reg. Atty., Dept. of Labor, Dallas, Tex., Bessie Margolin, Associate Sol., Dept. of Labor, Isabelle R. Cappello, Atty., Dept. of Labor, Washington, D. C., for appellant.

Percy N. Browne, Shreveport, La., Browne & Lafargue, Shreveport, La., of counsel, for appellees.

Before HUTCHESON and BROWN, Circuit Judges, and SIMPSON, District Judge.

SIMPSON, District Judge.

We review, on appeal by the Secretary of Labor, a judgment of the District Court which resulted from a jury verdict in favor of the employer-defendant.[1] At the request of Melvin May, the alleged injured employee, the Secretary brought this action to recover from the defendants, E. A. LaFitte, Sr., and E. A. LaFitte, Jr., individually and as copartners in the LaFitte Company, a partnership, unpaid minimum wage and overtime compensation due and owing under the provisions of the Fair Labor Standards Act of 1938 (Title 29 U.S.C. § 201 et seq.). The Secretary asserted that this compensation was due Melvin May because of defendants' violation of the provisions of Sections 6 and 7 of said Act, Title 29 U.S.C. §§ 206 [2] and 207,[3] the minimum wage and overtime provisions.

The LaFitte Company was engaged in the lumber business and had one saw-

[1]. The case was submitted on special interrogatories under Rule 49(a), F.R.Civ.P. Three interrogatories were propounded to the jury with instructions that should they answer the first interrogatory in the negative, the last two required no answer.

(A) Do you find that the employee, Mr. Melvin May, was regularly and substantially engaged in the production of goods for commerce during his employment by the defendant from October 25, 1959, to September 10, 1960?

This interrogatory was answered in the negative, and, consequently, the remaining two were returned unanswered.

(B) If you have answered Interrogatory No. 1 in the affirmative, how many weeks, if any, during the period from October 25, 1959, to September 10, 1960, do you find that the employee, Mr. Melvin May, was regularly and substantially employed in the production of goods for commerce?

(C) If you answer Interrogatory No. 1 in the affirmative, what do you find was the number of hours regularly worked per day by the employee, Melvin May, during the period of his employment from October 25, 1959, to September 10, 1960?

[2]. Section 6 provides:
"(a) Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—
"(1) not less than $1 an hour;"
the remaining provisions are not material in this case.

[3]. Section 7 provides:
"(a) Except as otherwise provided in this section, no employer shall employ any

mill plant. On October 25, 1959, Melvin May was employed by the company for the purposes of tending the boiler [4] and kilns [5] and also as a night watchman. He went to work at 6 P.M., which is undisputed. However, there is a conflict between May and the company as to whether he was to knock-off at 5 A.M. or 6 A.M.[6] In the production of lumber, after the logs have been cut, it is necessary that it be dried in steam-heated kilns for 72 to 96 hours. Even though the sawmill closed down at 4:30 P.M., the kilns remained in operation continuously. Tending the kilns and the boiler consisted of periodic checks and making minor adjustments when necessary. Although Mr. E. A. LaFitte, Jr., testified Melvin was not employed as a night watchman, according to Melvin May, much of his time, between checking the kilns and boiler, was spent inspecting the yard and other buildings.

It was established by the evidence that approximately 14% of LaFitte's gross income during the period involved came from sales made either to out-of-state buyers or to in-state buyers as manufacturers or processors whom the defendants knew or had good reason to believe shipped their finished products in interstate commerce.[7]

■ It is now firmly settled that the volume or amount of interstate business is not material. Sams v. Beckworth, 5 Cir., 261 F.2d 889; Mitchell v. Royal Baking Co., 5 Cir., 219 F.2d 532. In Mitchell v. Jaffe, 5 Cir., 261 F.2d 883, involving a salvage firm which made 1.67 per cent of its annual volume of sales to interstate buyers, this Court held that this was sufficient to be covered by the Act. In the instant case, it was undisputed that as to prospective customers there was maintained no pattern of product segregation, other than as to the quality of the lumber.

■ The trial judge, we think correctly, instructed the jury that the LaFitte Lumber Company was engaged in interstate commerce as a matter of law. He proceeded, however (see Footnote 1, supra), to submit for jury determination the question of coverage under the Act of Melvin May, the employee. As noted, the jury, by its negative answer to the first of the three special interrogatories, found that the employee was not covered. Whether employee coverage was a factual question for the jury or whether it should have been resolved by the trial judge as a matter of law is the crucial question on this appeal.

The basis for the Secretary's first specification of error is that under the facts of this case, the evidence thoroughly demonstrates that Melvin May, as an employee, was engaged in the production of goods for commerce or in the alternative, at least his job was a closely related process or occupation directly essential to the production of goods for commerce,[8]

of his employees who is engaged in commerce or in the production of goods for commerce for a workweek longer than forty hours, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

No other subsection applies to this employee, Melvin May.

4. Boiler tending consisted of watching the boiler to see that the water level was kept at the proper level and to see that the fire was regulated so that the steam would be maintained at the proper pressure.

5. Tending the kilns consisted of checking to see that the kilns went on and off; to see that they were dripping properly; to see that the spray was working; and to see that it was operating properly.

6. This dispute was submitted to the jury under Interrogatory No. 3. Since it was not answered at that time, it will have to be decided on remand.

7. During the period in question, October 25, 1959, to September 10, 1960, the company's total gross sales was approximately $251,000.00, of which $36,040.00, represented the sales involving directly or indirectly interstate commerce.

8. 29 U.S.C. § 203(j) provides in part:
(A) "and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods

and consequently, this issue[9] should not have been submitted to the jury. Rather, contends the Secretary, the undisputed facts called for instructions that, as a matter of law, Melvin May was covered by the Act. We agree.

No question is involved here as to whether or not a substantial portion of May's work was directly or closely related to interstate movement of goods. If his work is such that he becomes entitled to coverage under the Act, then he is covered in toto, inasmuch as the evidence is undisputed that he performed the same function each night of each week he worked.

Our decision must rest on whether this type of work meets the requirements as defined in Section 3(j) (Title 29 U.S.C. § 203(j)).

In the preparation of lumber for market, it is necessary that it be dried and treated. Consequently, all the processed lumber must remain in these kilns for a period of between 72 and 96 hours. Heat is provided by steam which is generated by the boilers. May's position as a boiler tender and kiln tender was a necessary step in the chain of events that started with a log and ended with a finished board of processed lumber. In another lumber case, Hart v. Gregory, 218 N.C. 184, 10 S.E.2d 644, 130 A.L.R. 265, which involved a suit for unpaid minimum wages and unpaid overtime compensation, the employee was a night watchman, whose additional duties included firing an engine so as to keep up steam which furnished power for the sawmill. The Supreme Court of North Carolina said:

"Applying the true principle of these Supreme Court decisions to the facts concerned here, it is found that the plaintiff, serving as he was as nightwatchman to protect all the property and equipment at an employer's plant where interstate commerce goods were produced and also performing the additional duties of firing an engine so as to keep up steam and have the engine ready each morning for use in connection with interstate commerce was in actuality engaged in the production of goods for interstate commerce within the meaning of Sections 6 and 7 of the Fair Labor Standards Act."

In the case of Wood v. Central Sand & Gravel Co., 33 F.Supp. 40 (W.D.Tenn.), the identical facts were present. In like fashion, the District Court held that the employee was engaged in the production of goods for interstate commerce, and consequently covered by the Act. These cases were decided before the 1949 amendment to Section 3(j).[10]

In a third case also decided before the 1949 amendment, Kirschbaum Co. v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638, the employees in question were firemen and other maintenance operators of a loft where clothing was made for interstate commerce. The main function of these firemen was to produce heat, hot water and steam necessary to the manufacturing operations. The Court held that they came within the statutory definition, to-wit: " * * * in any process or occupation necessary to the production thereof, in any State."

The principles enumerated above appear to us to control our case. Certainly, drying the lumber is as much an essential factor in this process as that of cutting the logs. Manning these boilers and kilns, whether by day or night, is

if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods."

(B) "or in any closely related process or occupation directly essential to the production thereof, in any State."

9. See note (1), supra.

10. Before the amendment the section read: " * * * [A]nd for the purpose of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was * * * in the process or occupation necessary to the production thereof, in any State." The amendment inserted "closely related" before "process", and "directly essential" was substituted for "necessary".

an occupation directly essential to the production of goods for interstate commerce, so that Melvin May must as a matter of law be said to be covered by the Act.

On remand, the District Court should not submit the issue of coverage of Melvin May. Instead the jury should be instructed that both employer and employee were covered by the Act during the critical period.

█ The Secretary's other claim of error involves the dismissal of E. A. LaFitte, Jr., as a party defendant. He claims that E. A. LaFitte, Jr., is a partner, or if not, he is within the definition of an employer under Section 3(d). (Title 29 U.S.C. § 203(d).) [11] The dismissal of LaFitte, Jr., at the beginning of the trial, was based on a showing that he was not included as a partner in the partnership papers. That alone does not appear to be sufficient. Coupled with the testimony adduced at the trial that he received no salary, was a showing that he shared in the distribution of profits at the end of the year, and a showing by the testimony of E. A. LaFitte, Sr., that the company was a partnership between himself, his sisters, and his heirs. LaFitte, Jr. and his father hired employees; he had authority to fire them; he directed their work. He was the principal defense witness at trial as to the details of company operation. It becomes apparent that E. A. LaFitte, Jr., was prematurely and improvidently dismissed as a party defendant, and should be reinstated when the case is sent back to the lower court.

We express no view as to the proper ultimate disposition of this question. On retrial, the question of whether he was a partner, or was otherwise an employer within the meaning of the Act, may require decision by the jury. Contrariwise, the proof may develop so that no such issue need be submitted.

In summary, our holding is that both employer and employee (not the employer alone, as the District Court held) were covered by the Act as a matter of law; that the disputed questions of agreed hours of work, hours actually worked, unpaid minimum wages, and compensation for overtime must therefore now be tried to a jury; and that the subsidiary question of LaFitte, Jr.'s liability as partner *vel non* or employer *vel non* may also require submission to the jury, depending upon the state of the evidence.

To the end that these matters may be accomplished, the judgment below is reversed for further and not inconsistent proceedings.

Reversed.

---

11. Sec. 3(d) provides in part:
  "Employer includes any person acting directly or indirectly in the interest of an employer in relation to an employee * * *.''